LAND, J.
 

 On October 1, 1912, a contract of partnership, for the practice of law in the city of New Orleans was entered into between Donelson Oaffery, Lamar O. Quintero, and J. Marshall Quintero, under the firm name of Oaffery, Quintero & Brumby. It is stipulated in this contract that:
 

 “All earnings, after payment of firm debts and expenses, shall be divided equally between Donelson Oaffery, Lamar O. Quintero, and J. M. Quintero.
 

 “This contract of partnership can be annulled by any one of the partners after 30 days’ no- ' tice.”
 

 It is further provided in’ the partnership agreement that:
 

 “The law business of said Oaffery, at his office in Eranklin, La., is divided by said Oaffery with Robert Brumby as may be agreed upon between them, said L. O. Quintero and J. M. Quintero shall have no interest in the Eranklin business, and said Brumby shall have none in the New Orleans business.
 

 “It is further agreed that J. M. Quintero shall retain and carry on his notarial business and shall have all of the fees therefrom, and that Lamar O. Quintero shall retain for his own account the salary he receives as general attorney for the Tropical Divisions of the United Fruit Company.”
 

 
 *1057
 
 This partnership was dissolved by mutual consent on June 26, 1919, effective as of date August 1, 1918.
 

 The present suit has been brought for a settlement of the partnership affairs of the late firm of Caffery, Quintero & Brumby.
 

 Plaintiffs claim two-thirds of the following fees in the “Sugar Suits”:
 

 Gross fees collected by firm................ $ 82,420 76
 

 Less fees paid other counsel associated with us in these eases, which were brought by the firm and Richardson..... 21,037 63
 

 Net fees collected by firm.................. $ 61,383 13
 

 Amount of fees collected by Richardson.. 40,481 90
 

 Special fee in Myrtle Grove Case, collected by Caffery, retained by him and which he refuses to turn into firm...... 25,000 00
 

 Total net fees earned................... $126,865 03
 

 The petition charges bad faith, fraud, and deceit, practiced upon plaintiffs by the defendant, Donelson Caffery, in the division of these fees, and especially through the medium of a pooling arrangement or agreement between defendant, Donelson Caffery, and E. Rivers Richardson, for the division between them of the fees received by them in the sugar litigation.
 

 Plaintiffs allege that the agreement between Mr. Caffery and themselves for the division, of these fees, upon a basis of two-thirds to Caffery and one-third to themselves, was predicated upon the condition that the special fee of $25,000, received by Mr. Caffery under the compromise in the “Sugar Suits,” should be divided equally between plaintiffs and Mr. Caffery in the proportion of one-third each.
 

 Defendant denies in his answer the charges of bad faith, fraud, and deceit preferred against him by plaintiffs, and avers that plaintiffs acted with complete knowledge and understanding and acquiescence as to any and all matters and things of which “they now deliberately pretend and falsely plead ignorance and error.”
 

 Defendant avers that E. Rivers Richardson was regularly taken into said cases, for reasons and equities fully acquiesced in by plaintiffs, and that it was only long after the engagement of said Rivers Richardson that any arrangement was made for an equal division of fees with him, and that said arrangement was laid before plaintiffs for participation therein, if they so-desired.
 

 Defendant admits the compromise of the “Sugar Suits” for $600,000, and that a contingent fee of 40 per cent, was divided among the attorneys in those eases.»
 

 Defendant denies that his right to receive two-thirds of the firm’s part of the contingent fee was based upon any agreement upon his part to divide .with plaintiffs the special fee of $25,000, allowed him in the compromise agreement of the “Sugar Suits,” and avers that it was unconditionally agreed and understood by and between him and the plaintiffs that defendant should receive two-thirds of the share of the fees received by the partnership in said litigation, for the reason .that plaintiffs had not assumed any- of the responsibilities and burdens of the litigation.
 

 Defendant avers that, in making out returns to the United States government for the income tax, each of the plaintiffs, unconditionally and without the alleged inducement from defendant, accounted for one-sixth of the share of the fees recovered by the partnership in said suits, and participated in defendant’s returning two-thirds of said fees as belonging to him.
 

 Defendant avers that, pursuant to the agreement of compromise, the sum of $25,000 was paid to him in consequence of the provision in the act of Congress known as the Sherman Anti-Trust Law (U. S. Comp. St. §§ 8820-8823, 8827-8830), imposing the payment of a fee by any person or corporation against whom recovery under such act of Congress is had; it being understood by and between defendant and the plaintiffs that defendant individually was justly entitled to
 
 *1059
 
 and should retain said amount so paid by the American Sugar Refining Company to him in the suit of the Myrtle Grove Planting Co. v. American Sugar Refining Co.
 

 Defendant denies his indebtedness to the firm in the sum of $12,708 as an overdraft, and alleges that upon a correct audit of the firm’s books a balance will be due him and for which he prays judgment in reconvention.
 

 Defendant .alleges that the fee of $1,000 claimed' by plaintiffs in foreclosure proceedings against thd Vermillion Sugar Company is a fee due to the Franklin office of Caffery, Quintero & Brumby, and that, under the partnership agreement, plaintiffs have no interest in same.
 

 Plaintiffs plead estoppel against defendant, based upon admissions alleged to have been made by him, and defendant pleads estoppel against plaintiffs, based upon plaintiffs’ knowledge of, and acquiescence in, the arrangement and the division of fees under same.
 

 In order that we may pass intelligently upon the main issues involved in the settlement of the partnership affairs, it becomes necessary for us to review the history of the celebrated “Sugar Suits.”
 

 1. In the beginning of the year- 1913, the firm of Caffery, Quintero & Brumby became associated with F. Rivers Richardson in what are commonly known as the “Sugar Suits.” The first of these suits brought in the federal court in city of New Orleans was that of Wogan Bros. Sugar Refining Company v. American Sugar Refining Co. (D. C.) 215 F. 273. The Wogan Bros. Company was the client of F. Rivers Richardson, and the firm of Caffery, Quintero & Brumby became associated with Mr. Richardson in this case, through Donelson Caffery, as the representative and active participant of his firm.
 

 -In the investigation of the Wogan Bros.’ suit, Mr. Caffery and Mr. Richardson had discovered jointly a cause-of action for damages against the “Sugar Trust,” on behalf of the sugar planters of this state, and it was this fact that led to the subsequent institution against the American Sugar Refining Company of an avalanche of suits, 185 in number, with an array of 225 attorneys representing various claimants, while the firm of Caffery, Quintero & Brumby and F. Rivers Richardson were associated in about 125 of these cases. After protracted litigation, lasting from the the early part of the year 1913, until April 7, 1917, and after the failure of several efforts at compromise, the “Sugar Suits” were finally settled. for the sum of $600,000, of which the claimants in these suits received 60 per cent., the attorneys a contingent fee of 40 per cent., and a special fee of $25,000 was awarded to Donelson Caffery, Esq.1
 

 The written agreement of compromise is as follows:
 

 “State of Louisiana, City of New Orleans:
 

 “This agreement witnessetk:
 

 “That the parties plaintiff in the hereafter described suits,
 
 represented by the undersigned attorneys as a committee appointed by the attorneys of record in said suits, and the defendants in said suits,
 
 have hereby compromised, settled, and adjusted all the claims and demands made in said suits, together with all of the claims of the parties plaintiff to date of a nature similar to the causes of action asserted in said suits, upon the following terms and conditions :
 

 “1. The suits and claims hereby adjusted are the 185 suits and the claims of the parties who are plaintiffs in the suits in the United States court for the Eastern district of Louisiana, set forth in the annexed list.
 

 “2.-The plaintiffs in said suits herein included shall dismiss the said suits and release the said claims to the date hereof.
 

 “3. The defendants shall pay, in full settlement and compromise of all of said suits and claims herein included, to be apportioned among the plaintiffs as the undersigned committee of lawyers shall hereafter direct, the sum of six hundred thousand ($600,000) dollars, in cash,
 
 and shall further pay as a special attorney’s fee, in the suit of Myrtle (prove Planting Company to Donelson Caffery, Esq., the sum of twenty-five thousand ($25,000) dollars.
 

 
 *1061
 
 “4. The respective plaintiffs and defendants shall pay each their own court costs.
 

 “5. It is understood that the counsel for plaintiffs in said suits have entered into an understanding with each other calculated to discourage in the courts, or otherwise, further controversies arising up to this date relating to the subject-matter herein dealt with.
 

 “6. Payment of the respective amounts shall be made to the individuals entitled thereto in the manner which has been mutually agreed upon and set forth in a memorandum this day.
 

 “7. The defendants agree that they will deposit in one or more of the banks of the city of New Orleans a sum sufficient to cover the entire amount herein agreed to be paid. Said deposits to be made within one week from and after this date, and that they will keep the same on deposit in this city to be drawn on in meeting its obligations under this agreement.
 

 “Signed this 7th day of April, 1917, at the city of New Orleans.
 

 “Original signed: W. B. Spencer, R. E. Milling, C. E. Borah, Donelson Caffery, Committee Representing Plaintiffs in the Above-Described Agreement. The American Sugar Refining Company and Jackson E. Witherspoon, by Joseph W. Carroll, Geo. Denegre.”
 

 In the testimony of Hon. Robert E. Milling, who signed the above agreement of compromise as an attorney for the sugar planters, it is made clear that he suggested this special fee of $25,000 for Donelson Caffery, and insisted upon it being made a part of the compromise. Mr. Milling states that the reason why this special fee was paid to Mr. Caffery was that he had done a great deal for his (Milling’s) clients, as well as for others, in the “Sugar Suits,” and that he considered “that it was only right to include it in the compromise and give him that fee separately.”
 

 On cross-examination by Mr. McCaleb, attorney for plaintiffs, Mr. Milling testified as follows:
 

 “Q. And the fee was $25,000 for his services in those cases?
 

 “A. The
 
 extra
 
 compensation was given him, as I would say,
 
 ‘on account of his handling the cases,
 
 etc.’
 

 “Q. Mr. Caffery was a member of the New Orleans firm of Caffery, Quintero & Brumby?
 

 “A. Well, he was a member of the firm in which Mr. Quintero was,
 
 but as far is the'firm,, was concerned, I knew only Mr. Cafery.
 

 “Q. Well, was not the firm counsel in the cases; that is, did not the firm appear in the cases?
 

 “A.
 
 I do not know who signed the petition, or who the pleadings were signed by, but I do know that Mr. Cafery handled it."
 

 It is patent from the testimony of Mr. Milling that he did not even know that the Quin•teros were of counsel in the “Sugar Suits.” He only
 
 knew Mr. Caffery
 
 in the matter, and that the sole purpose of Mr. Milling in securing this special fee for Mr. Caffery was to reward
 
 Mm with an extra fee for services rendered m these oases,
 
 which had inured largely to the benefit of the clients of Mr. Milling, as well as to that of other sugar planters involved in this litigation. Mr. Milling testifies that, while millions were involved in these suits, the question was also at issue whether the people should not be discriminated against by the refiners, that the compromise effected benefited the Louisiana sugar planters to a very great extent, and that another thing gained was the question of determining the weights and the tests of the sugar, and the question of delivery. Mr. Milling states in his testimony that the conducting of this compromise by Mr. Caffery involved more than a mere knowledge of law and generalship, in the handling of the cases in the court, but also discretion, tact, energy, and shipper’s experience.
 

 It should be observed that the special fee of $25,000 was paid to Mr. Caffery in the suit of the “Myrtle Grove Planting' Company” against the American Sugar Refining Company.
 

 The late Theodore Wilkinson was the manager of the Myrtle Grove Company, and Hon. James Wilkinson, his brother, was associated with Mr. Caffery and Mr. Richardson in'that case. Hon. James Wilkinson testified that the “Sugar Cases” were compromised for $600,000, and that Mr. Caffery was to receive a special fee of $25,000.
 

 
 *1063
 
 “Q. Did you know about the arrangement with regard to the special fee before or after the compromise?”
 

 “A. I think it was while the compromise was being discussed, I believe, I was called in with Mr. Wilkinson, my brother, who was manager of the Myrtle Grove Company at that time, and which was, I think,
 
 a test case,
 
 or a case brought in which most of the testimony was taken to be used in all similar cases that would follow. We discussed the matter considerably before the compromise was entered into, that is my recollection, and subsequently also.”
 

 Mr. Caffery also testifies that:
 

 “The Myrtle Grove suit
 
 was singled out as a test case. All motions and exceptions came up
 
 in the Myrtle Grove case,
 
 with the understanding that the other cases should be bound by the result
 
 in the Myrtle Grove case."
 

 Hon. James Wilkinson, in stating the nature and extent of Mr. Caffery’s labors in the “Sugar Oases,” testified as follows:
 

 “I think it involved originally
 
 cm ouster suit
 
 that went through
 
 this court and the Supreme Court of the state.
 
 My recollection is that that suit alone was an enormous matter,
 
 an attempt to oust the sugar trust,
 
 as it is called, that had a strangle hold upon the sugar industry of the state, and was dealing unfairly with the planters of the state, which suit, however, to my recollection, was finally lost in the Supreme Court. Then Mr. Caffery took the matter up in the Legislature and also at the Constitutional Convention. He was in Baton Rouge a long time, and I remember at one time this discussion taking place in the Legislature or in thb Constitutional Convention.; I have.forgotten if—it has been so many years ago—but I think
 
 the ouster suit
 
 was used as a club to force the sugar trust to do justice by the defrauded sugar planters of Louisiana. The principal complaint was that they would buy sugar from the planters at a 96 test, or a certain saecliarimeter test, or polariscope test, and these sugars were to be paid for at a certain price, and when they got to New York the sugar trust would make-fictitious sales at lower tests and lower prices, thereby defrauding the sugar planters of Louisiana out of much more than the $600,-000 which they gave in compromise, in fact, it ran into millions; but, by this litigation and work of Mr. Caffery, he not only got back $600,-000 of the money the sugar planters had been defrauded out of and which they considered a hopeless suit, but he also broke up the practice that was defrauding the people of Louisiana out of millions annually; and, in that way,
 
 I believe the labors of Sereníes were small compared to the work Mr. Cafery did in these var rious suits and litigations. I believe it was the most signal success that has ever been achieved at this bar, and I think his services were practically unaided, because he had so familiarised himself with every detail that associated counsel were not called upon to do very much work.”
 

 What labors did the plaintiffs perform in these “Sugar Cases” that entitle them to a division, share and share alike, with the de-' fendant, Donelson Caffery?
 

 We will let the testimony of the plaintiff, Mr. J. Marshall Quintero, answer this question:
 

 “Q. Did any of the planters come to you personally, Mr. Quintero?
 

 “A. No; a few came, and it happened when Mr. Caffery was out, and I suggested that they come back when he was in, or that they wait for his return,
 
 as Mr. Cafery was handling all of the suits against the American Sugar Refining Company.
 
 I am not presuming that
 
 I did any considerable amount of work in these sugar cases,
 
 and, if it is that which you are attempting to establish, I will admit it.”
 

 “Q. After the filing of the suits, Mr. Quintero, is it not true, after the Wogan Case, your principal duty in connection with the sugar cases
 
 was the filling in of the blanks
 
 made in the petition of Mr. Caffery and Mr. Richardson?
 

 “A. That is correct so far as my work in those cases is concerned.”
 

 It is clear, therefore, that the plaintiffs in this case, according to the admissions made by Mr. J. Marshall Quintero himself, are not entitled, for any equitable reasons, to share, in equal proportions with the defendant, Donelson Caffery, in the division of the special fee of $25,000, as neither of the plaintiffs did a proportionate share of the work in the “Sugar Cases.”
 

 The agreement of compromise in these cases was signed April
 
 7,
 
 1917. Mr. J. Marshall Quintero was advised by Mr. Caffery as to this compromise a day or two after it was made, according to his own testimony.
 

 Mr. Caffery has testified, and we believe truthfully, that plaintiffs were advised by him as to every detail of. the compromise
 
 *1065
 
 agreement in the “Sugar Cases immediately upon its consummation, as well as to the several efforts to compromise those cases, made prior to the final settlement.” See, also, testimony of R. E. Brumby, as to discussions as to compromise in the New Orleans office.
 

 “Transactions have, between the interested parties, a force equal to the authority of things adjudged. They cannot be attacked on account of any error in law or any lesion. But an error in calculation may always be corrected.” R. C. C. art. 3078.
 

 Plaintiffs’ firm received net $61,383.13 in fees collected under the compromise agreement, and plaintiffs cannot be permitted to accept the part of said agreement favorable to themselves, and then repudiate this agreement as to the special fee of $25,000 allowed Donelson Caffery, the part of the agreement unfavorable to plaintiffs, as the payment of this special fee to Donelson Caffery is as much a condition of the compromise, as the payment to plaintiffs of the firm fees, or the payment to the sugar planters of their claims in these suits.
 

 The compromise agreement in this case must be accepted, or rejected, by plaintiffs as a whole, for it is the law of the case between all of the parties.
 

 “Agreements legally entered' into have the effect of laws on those who have formed them. They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law. They must be performed with good faith.” R. C. C. art. 1901.
 

 It is alleged in the petition in this case that defendant, in reporting the special fee of $25,000 to his firm, stated that the same had been paid to him by the American Sugar Refining Company in the “ouster suit” to enjoin the “Sugar Trust” from doing business in the state, and that as defendant, and not the firm of Caffery, Quintero & Brumby, was of counsel for the state, plaintiffs were not entitled to any part of this fee.
 

 Plaintiffs allege that said representation made to them by defendant was untrue, as—
 

 “said special fee was paid to said Caffery by the American Sugar Refining Company as an extra or special fee in the suit of the Myrtle Grove Refining Company v. American Sugar Refining Company,
 
 in which the firm of Caffery, Quintero & Brumby was leading counsel, and that said special fee-was not paid for any services rendered in said
 
 ouster proceedings."
 

 Plaintiffs allege that said representation was made to them by defendant, in order that he might, through fraud and deceit, deprive them of their portion of this fee.
 

 The plaintiff Mr. J. Marshall Quintero has testified on the witness stand in this ease to the above allegations in the petition; his co-plaintiff and brother, Lamar C. Quintero, having died before the testimony in the case was taken.
 

 Mr. Caffery, in his contradiction of the testimony of Mr. Quintero, says:
 

 “It is also
 
 absolutely untrue
 
 that I ever said that the special fee was paid
 
 in the ouster suit.
 
 It was not in accordance with the facts—that was never
 
 dreamed of
 
 by me. It was never
 
 dreamed of
 
 by anybody, and J. M. Quintero’s statement to that effect is either merely something that
 
 he has dreamed,
 
 or is deliberately false.”
 

 We regret that we are compelled to review the testimony of Mr. J. Marshall Quintero as to this phase of the case, and to point out the inconsistency and contradiction involved in the same.
 

 After stating that the checks in the “Sugar Suits” were made payable to Caffery, Quintero & Brumby, and F. Rivers Richardson, and that said checks were received by the firm of Caffery, Quintero & Brumby, and were indorsed by Mr. Caffery, or by the witness J. Marshall Quintero, and were sent by them to Mr. Richardson, who, after deducting his fee and sums advanced by him for costs, forwai’ded to the firm of Caffery, Quintero & Brumby a check for their part of the fee, Mr. Quintero testified as follows:
 

 
 *1067
 
 Statement No. 1.
 

 “Q. Did, you ask Mr. Caffery for the check for the special fee of $25,000?
 

 “A.
 
 The cheeks, as I stated, began to come in, in July of 1917, and I said to Mr. Caffery, ‘where is that check for that $25,000V
 
 and he said, ‘Why, that check is
 
 for me.’
 
 Then I said to-him, ‘How is that?’ And he argued with me,
 
 and said that he had done the greater part of the work, and that he should therefore be entitled to two-thirds of the contingent fee and the whole of the special fee.
 
 I said that I- could not see it that way. I said, ‘You have no agreement with me, Mr. Caffery, to give you an additional one-third of that special (contingent) fee; I know that you have spoken to Lamar and that it is agreeable to him if it is to me.’ I said, ‘I believe you are entitled to something, but I will only make concession to give you two-thirds of the contingent fee if you divide the special fee of $25,000.’
 

 “He got angry and walked out of the office into the library.”
 

 Statement No. 2.
 

 ,“And the
 
 next day,
 
 I believe it was, I spoke
 
 to
 
 him again and he said, ‘That fee has been paid me
 
 in- the proceeding brought by the state of Louisiana against the refinery to oust it from the state of Louisiana,’
 
 in which Mr. Caffery was alone of counsel.
 
 Se said that we were not in that litigation, that he alone handled that, and that he alone was entitled to that fee.
 
 I said, ‘Why Mr. Caffery, .it is impossible for you to accept
 
 a fee in this ouster proceeding from the American Sugar Refining Company; that it would be an immoral transaction.’
 
 I said, ‘Mr. Carroll is too high class a man to offer you a fee
 
 in the ouster proceeding, which was an attempt to oust this company from
 
 the■
 
 state of Louisiana.’
 
 He persisted that it was paid to him
 
 in that way,
 
 and I told him that I could not see it that way. I told him that if it was a proper fee received in this sugar litigation that we insist upon our share of it,
 
 and he said that he would adjust it to our satisfaction,
 
 and that ended the conversation in July, 1917, for the time being,” etc.
 

 Statement No. 3.
 

 “Q. Did you consent to the compromise as finally made?
 

 “A. I made no objection
 
 after Mr. Caffery verified
 
 what Mr. Ritter told me.
 

 “Q. Who told you?
 

 “A. Mr. Ritter, our stenographer. He heard that it had been compromised, and he told me about it,
 
 and' Mr. Caffery verified it.
 

 “Q. And you made no objection?
 

 “A. None.
 

 “Q. Mr. Caffery explained the compromise to you?
 

 “A. No; that is all he said. He said that the compromise was for $600,000, plus a special fee
 
 to us
 
 of $25,000, and he added that the compromise should have been for $1,000,000 and $50,000 special fee.”
 

 In statement No. 1, made on direct examination, Mr. Quintero testifies positively and unequivocally, that Mr. Caffery, in reporting to him the compromise in the “Sugar Suits,” stated that the special fee of $25,000 was
 
 for himself,
 
 because he had done most of the work.
 

 In statement No. 3, made on cross-examination, Mr. Quintero declares that Mr. Caffery, in advising him as to the compromise
 
 in the “Sugar Su,its,"
 
 made the statement that the special fee of $25,000 was
 
 “for us,”
 
 meaning the firm of Caffery, Quintero & Brumby.
 

 In statement No. 2, made on direct examination, Mr. Quintero states that Mr. Caffery reported the special fee as received by him
 
 in the “ouster suit.”
 

 Mr. Caffery’s contradiction of this last statement was wholly unnecessary, as the whole atmosphere of this case rebuts even the possibility of such a declaration from his lips.
 

 This compromise was made in a matter of great public moment. The entire sugar industry of the state was in jeopardy. Millions were involved in the sugar litigation.
 

 The compromise agreement was drafted by a committee of attorneys, representing the sugar planters in 185 suits, and also the 225 attorneys employed in these cases. This agreement was known to all of the attorneys, and approved by them.
 

 This compromise was not a secret barter, whispered in a dark comer. It was a written document, signed openly, and approved by all parties concerned, and its contents were known to plaintiffs, as to other members of law firms engaged in this controversy.
 
 *1069
 
 Under the terms of the compromise, a special fee of $25,000 was given to Donelson Gaffery, Esq.,
 
 “in the suit of the Myrtle Grove Planting Company.”
 
 This agreement constituted proper and sufficient evidence as to Mr. Caffery’s undisputed claim to this fee as
 
 an extra
 
 compensation for his signal services in the “Sugar Suits.” '
 

 Why, then, should he practice, or attempt to practice, any fraud or deceit upon plaintiffs in this case as to the origin of this fee? How could Mr. Gaffery possibly have made the statement to Mr. Quintero that the fee was
 
 “for us,”
 
 the firm, when such a statement was clearly against his interest, and clearly contrary to the true facts of the case, the fee having been given to him as the champion, above all others, in this tremendous struggle to free the sugar industry of the state from the tentacles of the “Sugar Trust.” What did Mr. Caffery have to hide or conceal about the matter? The fee had been awarded him in an honorable, public way, and as a meed of gratitude by his colleagues in the “Sugar Oases,” for services rendered by him, and inuring to the benefit of all of the clients of the host of attorneys in these suits.
 

 After bearing the brunt of the whole fight in the “Sugar Gases” for over four years in the courts, and, after demanding for his services a two-thirds division of the firm’s fees, in these cases, because the burden of the litigation rested solely upon his shoulders, is it to be presumed that Mr. Caffery, when presented with a special fee in the compromise of these cases, would be so magnanimous as to lay his hard-earned reward into the lap of his firm, the members of which had done nothing practically in these suits? • Unquestionably not. Is the fact of Mr. Caffery’s receiving this fee any more inequitable to the plaintiffs in this case than it would be to any member or members of any of the numerous law firms concerned in the' “Sugar Oases”?
 
 We
 
 think not.
 

 Not one cent of this special fee of $25,000 | came out of the pockets of any one of the attorneys in the “Sugar Suits.” They were to receive as compensation for their services under the compromise agreement a contingent fee of 40 per cent, of $600,000, and not a farthing more nor a farthing less. They received all of it, in full compromise and settlement of their entire claims for fees in the sugar litigation.
 

 If the Myrtle Grove Planting Company Case, the test case of all of these cases, had been pressed to final judgment, plaintiff firm could have recovered a reasonable attorney’s fee in the case under the provisions of the Sherman Anti-Trust Act. Such a fee evidently was paid by the American» Sugar Refining Company in compromise in the single
 
 test case of the Myrtle Grove Planting Company,
 
 and said company, as a party to this compromise agreement, consented to the payment of this fee to Donelson Caffery, Esq.; the compromise agreement as to this fee being fully known to the Honorable Theodore Wilkinson, manager of said company, as well as to his brother, the Honorable James Wilkinson, as shown by the testimony of the latter, who was associated as counsel with Mr. Caffery and Mr. Richardson in the Myrtle Grove Planting Company Case.
 

 If the compromise agreement had proposed the special fee in these cases for plaintiffs’ firm, evidently such proposition would have been rejected by the other firms engaged in these suits. Plaintiffs having approved the compromise agreement, and having consented that Mr. Caffery should retain the special fee, the. stipulation of such fee in his favor becomes the special law of the case, and must be enforced, regardless of what may be the general law upon the subject of special fees received by the member of a firm.
 

 Defendant therefore is not entitled to this special fee as a part of the earnings of the firm of Caffery, Quintero & Brumby in these cases. Plaintiffs, however, have alleged in the petition in this case that their
 
 *1071
 
 agreement to divide the firm’s fees received in the “Sugar Suits” with the defendant, on the basis of two-thirds to him and one-third to them,
 
 was conditioned
 
 upon defendant’s consent to divide his special fee of $25,000 equally between the partners.
 

 Defendant denies this, both in his pleadings and in his testimony. On the contrary, he asserts that the agreement with plaintiffs to divide the firm’s fees in the proportion of two-thirds to himself and one-third to them was
 
 unconditional,
 
 and was based solely upon the fact,
 
 “that plaintiffs had not assumed any of the responsibilities and burdens of the litigation.”
 
 See answer of defendant.
 

 We are confronted in this case with a most unusual situation as to the two-thirds agreement for the division of
 
 the contingent fee
 
 of the firm of Caffery, Quintero & Brumby.
 

 With litigation lasting from the early part of January, 1913, to April 7, 1917, when the compromise was effected, plaintiffs contend that the basis for the division of the
 
 contingent fee
 
 was the division of a special fee, not. contemplated by the parties, and which came into existence
 
 onl/g as the result of a compromise, at the end of the litigation, extending through a period of over four years.
 

 Such contention, in our opinion, is not only unreasonable in itself, but clearly is not supported by the facts of the case.
 

 The trial judge was satisfied from the evidence before him that the two-thirds division agreement was not based upon
 
 the condition
 
 of the equal division of the special fee by Donel'son Caffery, the defendant.
 

 It is said in the opinion of the lower court:
 

 “After the litigation was in progress, the entire burden of- the work being on Mr. Caffery, he felt that there ought to be a redivision of those fees, and a new agreement was entered into by which Mr. Caffery was to receive two-thirds of the sugar fees going to his firm. * * * I think undoubtedly he is entitled to two-thirds of the fees received by the firm of Caffery, Quintero & Brumby from the sugar eases, which amounted to $61,383.13, and of which he would be entitled to $40,922.09.”
 

 Mr. Caffery testified as follows concerning the two-thirds division agreement:
 

 “Q. Now, what was the consideration for giving you that two-thirds, as you state? A. The consideration was that L. C. Quintero was getting his salary from the United Eruit Company and was not putting it into the firm, not dividing it, and that J. M. Quintero was. getting his notarial fees, and not putting them into the firm;
 
 and that when the sugar oases came up, and it developed there was to be a great legal battle,
 
 I went to them and said, ‘This thing may last a lifetime; it is absorbing me; and it is not fair to me that I should go on and carry through this fight and you receive two-thirds and I receive one-third.’. I put that before, I think, J. M. Quintero first, and he said, ‘Take it up with Lamar,’ and I took it up with Lamar C. Quintero, and he agreed to it, and then I saw J. M. Quintero, and told him that L. C. Quintero agreed, and he agreed to it;
 
 and it was the very basis upon which I made the fight in those cases.
 
 It was well understood, without any question whatever; except,
 
 when long after the fees had come in,
 
 and J. M. Quintero made his claim to a share in the $25,000 special fee, he insisted that he ought to receive, he and his brother, one-third of that fee, or $8,000; and I told him that, under the circumstances, they were not entitled to it; and, just before the dissolution of the firm, he said to me, ‘Well, I won’t be bound by the arrangement that will give you two-thirds interest in the sugar fees.’ But up to that time, during all the time I was making the fight in those cases, he and L. C. Quintero had agreed that I should receive two-thirds of the fees and it was so returned in the income tax report.”
 

 Mr. Brumby corroborates the testimony of Donelson Caffery, in testifying to admissions made to witness, both by J. Marshall Quintero and Lamar C. Quintero, as to their consent to the two-thirds division agreement, relied upon by defendant in this case. Mr. Brumby has no pecuniary interest in this litigation.
 

 Mr. Caffery reported to Mr. Richardson that the two-thirds division agreement had been made.
 

 It is clear from the testimony of these witnesses that the two-thirds division arrangement as to the fees of the firm was consummated in the earlier stages of the litigation,
 
 *1073
 
 when, from the number of suits filed and the nature oi the issues involved, it became apparent that there would be a long and bitter fight.
 

 Mr. J. Marshall Quintero testified that:
 

 “I think it took probably two or three months before all the suits were gotten in. They were compelled to come in by a certain date, as Mr. Caffery feared that prescription might set in, and I think that the petitions were for that reason prepared hurriedly. The planters rushed into the oflice in great numbers.”
 

 Yet Mr. J. Marshall Quintero testified pos-' itively
 
 it teas not until March,, 1918,
 
 when the income tax returns were made by the firm,
 
 that it teas agreed, to divide the contingent fee tcith Donelson Gaffery
 
 on a two-thirds basis, provided he consented to a division of the special fee equally between the members of the firm.
 

 In other words, Mr. Quintero states that Mr. Caffery waited from
 
 March, 1918,
 
 when all the suits had been filed, until
 
 March, 1918,
 
 although the “Sugar Cases” were compromised in April, 1917, and all the work had been done,
 
 before he-attempted
 
 any readjustment as to the division of the firm fees. As a matter of fact, Mr. Quintero swore to his individual income tax return, and to that of his brother, as well as to that of the firm on March 27, 1918, before Donelson Caffery made his individual income tax return, which was sworn to by him on March 30, 1918. In the individual income tax return of J. Marshall Quintero and in that of his brother, Damar C. Quintero, as well as in that of the firm of Caffery, Quintero and Brumby, the Quinteros have charged themselves each with “one-sixth of $29,107.72,” their part of the contingent fee in the “Sugar Cases” ; but in the income tax return of the firm, Donelson Caffery is charged with “two-thirds of $29,107.72” as his part of the contingent fee in these cases. Neither of the Quinteros has charged himself in any of these returns with one-third of the special fee, which J. Marshall Quintero testifies that Mr. Caffery agreed to pay at the date of these returns; but we note, attached to the individual income tax returns of the Quinteros, the following memorandum:
 

 “This return being a cash return on fees actually collected and received, I do not account for my one-third ($8,333.33) of the special fee of $25,000,
 
 which is noxo held by Mr. Gaffery,
 
 because I have not received my one-third, but I will make an amended return when I receive this one-third.”
 

 Plaintiffs filed in evidence the individual income tax return of Donelson Caffery, in which we observe that he has charged himself with one-third of “special fee as attorney in ease of Myrtle Grove v. American Sugar Ref. Co. et al., $8,333.33.” We notice also that this return was sworn to by Mr. Caffery before “J. M. Quintero, Not. Pub.,” March 30, 1918. There is no memorandum annexed to Mr. Caffery’s return, but we find from the transcript that, at the time he made his return, he addressed a letter of date March 30, 1918, to J. Y. Faunterroy, Internal Revenue Collector, New Orleans, Da., in which he stated that two-thirds of this fee was being contested, and that, as long as that contest was pending, he did not think that he ought to return the fee.
 

 In corroboration of this testimony, Mr. Caffery offered a copy of this letter on page 9 of his private letter book.
 

 The ledger book of Gaffery, Quintero & Brumby was also offered in evidence, showing entry, “Ritter, $766.66,” in the month of October, 1917, charged against Mr. Caffery, who explained that he had been charged with two-thirds of a bonus which the firm had agreed to give to Mr. Ritter, the stenographer, because of his competent and faithful services during the “Sugar Suits,” and that, by reason of the fact that he (Caffery) was to get two-thirds of the contingent fee, he had been charged with two-thirds of that bonus.
 

 Mr. J. Marshall Quintero, although insist
 
 *1075
 
 ing in his testimony that no agreement was made with Mr. Caffery
 
 until at the date- of the income tax returns in March, 1918,
 
 attempts to explain the charge of two-thirds of the bonus of $1,150 paid to Mr. Ritter by Mr. Caffery, by stating that Mr. Caffery had said in July, 1917, that he would adjust the special fee to their satisfaction; and that he (Quintero) said that whatever he got over and above the firm had to constitute its just proportion to the general expenses, and that is why
 
 in October, 1917,
 
 he charged Caffery with two-thirds of the bonus given to Mr. Ritter.
 

 The testimony of Mr. Quintero, in which he states that Mr. Caffery had told him that he obtained the special fee in the
 
 ouster suit,
 
 is as follows:
 

 “I told Mm that, if it was a proper fee received in this sugar litigation, we insist upon our share of it, and he said
 
 he would adjust it to our satisfaction, and that ended the conversation in July, 1917, for the time being; and I must say that it was am, endless chase on my part after him to have him consent to divide that special fee
 
 until the time came
 
 for the making of the income tax returns
 
 (March, 1918), and then I tried
 
 to pin him down to it.”
 

 It was
 
 m March, 1918,
 
 that this witness states that Mr. Caffery
 
 finally consented,
 
 “with a good deal of displeasure,” saying,
 
 “If you all insist upon it, I guess I will have to do it.”
 
 Not a word is said in this conversation about dividing the expenses of the firm because of the two-thirds division of the fee, and, although there was
 
 “an endless chase”
 
 of Mr. Caffery until March, 1918, in order to
 
 “pin him down”
 
 to the division of the special fee, the witness states that he considered the matter
 
 settled in July, 1917,
 
 and charged Mr. Caffery with two-thirds of the expenses
 
 in October, 1917,
 
 because he was to receive two-thirds of the contingent fee.
 

 We note also that two-thirds of the income tax paid by the firm
 
 June IS, 1919,
 
 amounting to $1,367.40 is charged against Mr. Caffery, who states that the charge is made against him by reason of the circumstance of his getting two-thirds of the fees.
 

 It appears, therefore, that, even at this stage of the review of the testimony in this ease, both
 
 before
 
 and
 
 after
 
 the income tax returns in
 
 March, 1918,
 
 the defendant, Donelson Caffery, was charged with two-thirds of the bonus • of Mr. Ritter, the stenographer, and with two-thirds of the income tax of the firm.
 

 We now come to the consideration of document marked “D-l,” and found at page 90 of the transcript. This document is headed, “Our Position With Respect to the Special Pee of $25,000.”
 

 Mr. J. Marshall Quintero, when confronted with this document on the witness stand, admitted that he had presented it to Donelson Caffery; but stated that he thought it was
 
 “6 or 8 months after the income tax return.”
 

 The document in question reads as follows :
 

 “In October, 1912, Donelson Caffery, L. C. Quintero, and J. M. Quintero formed a partnersMp in writing for the practice of law, all fees and expenses to be divided share and share alike between them; that is to say, one-third of the fees to each and one-third of all expenses to be paid by each.
 

 “In November, 1913, a number of suits were brought by the firm of Caffery, Quintero & Brumby, wherein P. Rivers Richardson and other attorneys were of counsel. These suits were handled on a contingent fee basis.
 

 “Some while after these suits were brought, Mr. Caffery approached his partners and stated that, inasmuch as he was going to devote his entire time to this sugar litigation, he thought he should take two-thirds of the fees earned by the firm in these sugar suits, and that his partners, h. C. Q. amd J. M. Q., should divide the remaining one-third between them. His partners agreed to this,
 
 and, after a litigation covering a period of some three years, these suits were compromised,
 
 and the contingent fees are to be divided between the parties without controversy. But it appears that a special fee of $25,000 was paid the firm, the check being made payable to Mr. Cafery as a curtesy,
 
 and the
 
 question now arises as to how this special fee
 
 
 *1077
 

 of $25,000 shall be divided between the partners.”
 

 The rest of this letter is devoted to the reasons why the special fee of $25,000 should be divided equally between the partners, but there is not the slightest suggestion in this letter that the agreement as to the division of the $25,000 special fee was
 
 the condition
 
 upon which the division as to the contingent fee was based.
 

 The document ends with this statement, as the final conclusion of Mr. J. M. Quintero:
 

 “Now, if Mr. Oaffery wishes to retain the entire $25,000 special fee,
 
 then the proper adjustment is for the contingent fee to be divided share and share alike among the three partners,
 
 under
 
 the written contract.”
 

 This document distinctly states, in plain and unmistakable language, that there is
 
 no controversy between the partners of the firm, Oaffery, Quintero & Brumby as to the division of the contingent fee;
 
 but that it was
 
 a settled fact
 
 that Mr. Oaffery was to receive two-thirds and Lamar C. Quintero and J. M. Quintero, the remaining one-third of this fee, to be divided equally between them, or one-sixth to each. Mr. Quintero states in this document that the partners of his firm agreed to this division of the fees
 
 “some while after these suits were brought.”
 
 He does not pretend in this document that the agreement to divide this contingent fee, two-thirds to Mr. Oaffery, and one-third to the Quinteros, was made
 
 after
 
 the compromise of April 7, 1917.
 

 He does not pretend that it was not made until the income tax returns of the firm in March, 1918, and that this division of the contingent fee was
 
 conditioned
 
 upon the equal division between the partners of the special fee of $25,000.
 

 If Mr. Oaffery agreed with Mr. J. M. Quintero,
 
 in March,
 
 1918, when the income tax returns were made, to divide this special fee in consideration of receiving two-thirds of the contingent fee, as Mr. J. M. Quintero has testified, why does Mr. Quintero, “6 or 8 months
 
 after
 
 the income tax returns,’’ state to Mr. Oaffery in this document that he is entitled to the two-thirds of the contingent fee
 
 “loithout controversy,”
 
 because we promised that to you, but, under the equities of the case, you should divide the special fee equally between us?
 

 With document. D-l before us, it is clear that that part of the letter of October 1, 1919, addressed by the Quinteros to Donelson Oaffery, and demanding
 
 an equal division of all fees,
 
 contingent and special, is a self-serving declaration.
 

 It is to be noted, however, that the opening sentence in this letter of October 1, 1919. reads as follows:
 

 “For fully a year and a half
 
 we have been endeavoring to adjust with you,
 
 amicably, but in vain,
 
 the matter of the fees by our firm (Caffery, Quintero & Brumby) in what are known
 
 as the Sugar Suits,
 
 and it therefore becomes necessary for us to adopt such a course of conduct as will insure us a square deal and our proper proportion of the fees earned, and to require of you the paying into the firm the $25,-000
 
 special fee paid in the Myrtle Grove Case, which fee was collected personally by you, by having the American Sugar Refining Company make the check payable to your order,
 
 when you knew, and they knew, that the fee was
 
 a firm fee, earned in a matter in which our firm was counsel.”
 

 If we turn the calender back, “fully and a year and a half from October 1, 1919,” we find ourselves at April 1, 1918, or practically about March 27 or March 30,1918, the date of the income tax returns in this case for the year 1917.
 

 If plaintiffs had endeavored
 
 “in vain,”
 
 during all of this time, to adjust the special fee of $25,000 “amicably” with Mr. Oaffery, then how does Mr. J. M. Quintero explain his testimony to the effect that this matter was adjusted by Mr. Oaffery, at the date of the return of the income tax,
 
 in March, 1918,
 
 by agreeing to divide the special fee of $25,000 with the other members of the firm, in or
 
 *1079
 
 der to obtain for bimself two-thirds of the contingent fee?
 

 If such agreement was made
 
 in March,
 
 1918* why was it not referred to, in the letter of
 
 October 1, 1919,
 
 and insisted upon by the Quinteros, and why did Mr. J. M. Quintero, in document D-l, acknowledge the agreement as to the two-thirds division of the contingent fee in favor of Mr. Caffery to be
 
 without controversy,”
 
 and the request that the special fee of $25,000 be divided equally between the partners?’
 

 It is beyond all question, that the defendant is entitled to two-thirds of the contingent fee in this case.
 

 2. This brings us to the consideration of the alleged fraudulent pooling agreement between Messrs. Caffery and Richardson as to the division of the fees equally between them in the “Sugar Cases.” It is apparent that the division of the special fee of $25,000 is the storm center around which the various issues of this case have gathered and buffeted. With the elimination of this item from the accounting between the members of the firm of Caffery, Quintero & Brumby, the whole structure of fraud and deceit upon which this case has been reared topples to the ground through its own innate weakness. This is made plain by the following testimony of Mr. J. M. Quintero:
 

 “Q. .Now, you say that Mr.’ Caffery overdrew his account.' Mr. Caffery was credited with two-thirds of the sugar fees; as a matter of fact, does not
 
 the firm owe him $8,000?
 

 “A. About that amount, if liis position is
 
 eorreet; but, if he otees the firm the special fee,
 
 then it is a
 
 different situation.”
 

 This pooling arrangement was simply that Mr. Richardson should give to Mr. Caffery out of Mr. Richardson’s one-half of the fees, an amount sufficient to equalize Mr. Caffery’s earnings with Mr. Richardson’s, as Mr. Caffery was doing the w’ork in the cases.
 

 It is not disputed that Mr. Richardson received $40,481.90, as his share of the fees. This fact was well known to Lamar C. Quintero and J. M. Quintero, as every check in the “Sugar Suits” was made payable
 
 jointly
 
 to the firm of Caffery, Quintero & Brumby
 
 and F. Rivers Richardson.
 
 Each check was first received and indorsed by the firm, then sent to Mr. Richardson for distribution, and the balance returned to the firm, after Mr. Richardson had deducted his part of the fee and the costs advanced by him. The books were kept by Mr. Ritter, who was not only the stenographer and bookkeeper of the firm, but its confidential man, who handled the books with respect to all sugar transactions. These checks were indorsed at times by Mr. Chffery, and at other times, by Mr. J. M. Quintero. This is not denied.
 

 Mr. Lamar C. Quintero and Mr. J. M. Quintero were fully aware at the time that these fees were being divided
 
 equally
 
 between the firm and Mr. Richardson, and that Mr. Caffery claimed the special fee of $25,000.
 

 Document D-l, already discussed in this opinion, is a written confession as to this knowledge on the part of the Quinteros, and fully corrobox*ates Mr. Caffery in his testimony that he claimed this special fee at all times
 
 for himself,
 
 as well as two-thirds of the contingent fee of 40 per cent.
 

 Yet Mr. J. M. Quintero, when questioned by the court as to the manner in which these fees were distributed, swears that “We
 
 presumed he
 
 (Richardson) was retaining about one-third of' it,” when Mr. Quintero well knew that the gross fees collected by his firm and Mr. Richardson amounted to $82,-420.76, and that Mr. Richardson received of this amount practically one-half, or the sum of $40,481.90, with the special fee of $25,000 left entirely out of.the accounting. These figures are shown in the memorandum filed by plaintiffs in this case.
 

 Again, Mr. Caffery’s testimony that he informed the Quinteros of the fee arrangement between Richardson and himself is corroborated by the facts of the case.
 

 
 *1081
 
 Yet in the very face of these facts, showing full knowledge and complete acquiescence on the part of the Quinteros as to the equal division of fees between Mr. Richardson and Mr. Caffery in the “Sugar Cases,-” Mr. J. M. Quintero testifies that he knew absolutely nothing about this arrangement until
 
 in March, 1918,
 
 long after the compromise of these cases
 
 in April, 1917,
 
 and he endeavors in his testimony to impress the court with the idea that this pooling arrangement was a clandestine and foul thing, which was discovered by him through
 
 the accidental
 
 finding of a letter addressed by Mr. Richardson to Mr. Caffery.
 

 “Q. When was the first time that you heard
 
 of this pooling arrangement?
 

 “A. Some time preceding or previous to the filing of the income tax return.
 
 Our. stenographer
 
 brought me a letter which he said, I believe,
 
 he had picked up on the floor of Mr. Oaffery’s office,
 
 or from a pile of letters he had on his desk, and asked me,
 
 ‘What
 
 do you
 
 think of that V
 
 That was a letter addressed by Mr. Richardson to Mr. Caffery.
 

 “Q. What was the name of the stenographer?
 

 “A. Mr. Ritter.
 

 “Q. Is this the letter you referred to, marked ‘Exhibit O’?
 

 “A. It is dated March 12th; yes. This, of course,
 
 is a photographic copy of the letter.”
 

 We note that Mr. Ritter does not appear as a witness in the case to corroborate the statement of Mr. J. M. Quintero as to the finding of this letter on the floor of the office. We note also that Mr. Quintero admits in his testimony that the balance of the correspondence, consisting of photographic copies of letters marked “Exhibits D, E, and F,” was found in the files, but not
 
 until
 
 October,
 
 1918, when Mr. Quintero sent fpr the stenographer and told him. that he toas more familiar with the files than I was,
 
 and to get out the file. He got it out, and I got all of the correspondence together in chronological order.”
 

 On cross-examination, however, Mr. Quintero was confronted with the letters, marked “Exhibits E and F,” written by Mr. Caffery in reply to letters, marked “Exhibits C and D,” written by Mr. Richardson to Mr, Caffery, and, it appearing that the initials “D-C-R” are found at the bottom of each of Mr. Caffery’s letters, the witness was compelled to admit that Mr. D. C. Ritter, the firm’s stenographer, bookkeeper, and confidential man, had typewritten both of these letters for Mr. Caffery m
 
 the office of the firm,
 
 that these letters, pertaining to the sugar litigation, were all found in the files of the Sugar Suits', where they properly belonged, and had been left there in the office of Caffery, Quintero & Brumby, after the dissolution of the firm and after Mr. Caffery had severed his connection with the office.
 

 It also appears from the testimony of Mr. Quintero that Mr. Ritter was the office boy of Lamar C. Quintero and J. M. Quintero, previous to the time of Mr. Caffery’s becoming a member of the firm, that he entered their employment at the age of 14 or 15 years, and had been with the Quinteros 15 or 20 years, and was still in their office at the time this suit was being tried in the lower court.
 

 It is, then, a remarkable thing that Mr. Ritter, the stenographer to whom Mr. Caffery had dictated his leters to Mr. Richardson, did not consider such communications, at the time, of sufficient importance to advise the Quinteros of their contents. Mr. Quintero having discovered
 
 in March, 1918,
 
 the letter of Mr. Richardson revealing this monstrous pooling arrangement for the division of fees between Mr. Caffery and Mr. Richardson, it is more than remarkable that he should have
 
 waited until October, 1918,
 
 before he requested the stenographer to examine the files of the “Sugar Suits” in the office as to the balance of this correspondence.
 

 And what do the letters written by Donelson Caffery to F. Rivers Richardson show against Mr. Caffery? Nothing. On the con
 
 *1083
 
 trary, they show that Mr. Caffery kept faith with his firm, and refused to allow Mr. Richardson, as against the interest of the firm, to receive fees under the pooling arrangement between them, in the Beattie and Borah Cases, in which Mr. Richardson had not been associated with the firm. Mr. Caffery, in reply to the letter of Mr. Richardson of March 12, 1918, demanding such fees, stated in his letter to Mr. Richardson of March 16, 1918:
 

 “When it came to the Beattie and Borah Cases, I did what I could to have you associated in them too, but objections were made, and, as the eases were not mine, there was nothing I could do.
 

 “It was never in my mind
 
 that our agreement that the division of fees which I speak of should mean that you should participate in cases which were not ours, and in which I was unable to have you associated. You must have taken what we said with regard to the division of fees in the eases in which you were associated
 
 as applying to the Beattie and Borah Cases, but you are mistaken in this.”
 

 “It would certainly have been necessary
 
 for me to explain so far-reaehing an agreement, if it had existed, to the other members of the firm,
 
 but I did not do so, and nothing was said about it by anybody. ■ You can see how the other members of the firm must look upon the suggestion, now reaching them for the first time,
 
 that they should divide fees in cases, with one who was not associated at all.”
 

 Mr. Richardson, in his reply to this letter, insisted upon his original demand made in his first letter to Mr. Caffery, who replied as follows:
 

 “I would like to recollect the agreement concerning the sugar trust cases in the way you do, as I need not say how I would like to avoid any difference on the subject;
 
 but my recollection is just what I stated in my former letter,
 
 and I think your impressions to the contrary are due to your having drawn inferences, which I did not draw, or think of.
 

 “The question of the credit for bringing, or for conducting the cases, would be a fruitless one. It would not help us in the present question.
 

 “I carried out, to the very limit, what I thought was the professional requirement, that you should be associated in all of our cases like the Wogan Case; and now that I failed to get you associated in some of the cases in which we were associated only, I am distressed to find that you feel I have not gone as far as I should.”
 

 These letters are far from being private letters between Mr. Caffery and Mr. Richardson, secretly discussing a fraudulent conspiracy.
 

 Mr. Brumby testifies that
 
 he sano these letters when they were written,
 
 and that they are part, of a dispute that he had with Mr. Richardson about fees, and that Mr. J. M. Quintero and Mr. Caffery advised and assisted him in the matter.
 

 “Q. How do you know that Mr. Quintero (J. M.) was acquainted with the facts in those letters ?
 

 “A. I am not absolutely certain on that point. Those letters are part of the correspondence passing between the offices and Mr. Richardson in regal'd to money due me, and I think Mr. Quintero (J. M.)
 
 saw them.
 
 I put my answer that way because I understand that Mr. Quintero denies that fact; and, in the absence of being absolutely certain, I do not want to state that he did.
 
 The letters were in the office, and I am absolutely positive that I saw them at the time asid they passed into the usual channels of correspondence. I have stated to Mr. Quintero that I thought he saw them, previous to this.
 

 “Q. Now, when was the first time you saw those letters?
 

 “A.
 
 When they were written. I saw the originals that Mr. Caffery sent, carbons of which are there; and I saw the original which Rivers Richardson used as his reply at the time—they we dated.
 

 “Q. You saw them at the time they are dated?
 

 “A. Yes, sir.
 

 “Q. How did you come to see them?
 

 “A.
 
 They were part of some negotiations that were going on between Mr. F. Rivers Richardson and myself and the New Orleans (office) for a division of some fees.
 

 “Q. In other words, you had some dispute with Mr. Richardson about fees in which you were interested, which Mr. Richardson was holding and refused to turn over; you had some dispute about them?
 

 “A. I did.
 

 “Q.
 
 And that brought about these particular letters marked ‘Exhibits G. D. E and F’f
 

 “A.
 
 Yes, sir; I think that these are the concluding letters in the negotiations.”
 

 Mr. Caffery testifies as follows:
 

 
 *1085
 
 “Q. And your answer of March 13 sets forth what parts of that letter of Mr. Richardson is untrue, is that it?
 

 “A. Well, I would not say that, because the only question before us at that time was
 
 with regard to a settlement with Mr. Brumby,
 
 and it might be that there were matters concern-' ing Mr. Richardson that I did not consider in my reply; but I am sure that the statement that I made to Mr. Richardson in my letter of the 13th, replying to his of the 12th, was correct. I cannot say, however, that I analyzed all of his letter of March 12 and corrected any misstatements which might have been in it.”
 

 Mr. Caffery also testifies:
 

 “It is absolutely untrue that the letters annexed to this petition were
 
 in any way coneedled
 
 from the Quinteros. What happened was
 
 that Mr. Brumby had a question unth Mr. Richardson,
 
 and I took up that question with Mr. Richardson. It is untrue that I was lukewarm in the matter, because I felt
 
 that Mr. Brumby ought to be settled with,
 
 and it was by reason of my letters that settlement took place,
 
 and those letters were written in collaboration with J. M. Quintero. They were submitted to him before and after being signed; the letter I wrote to Richardson and Richardson’s letter to me were submitted to him.
 
 I will not be positive that they were submitted to L. C. Quintero, but, to the best of my recollection, L. C. Quintero was a party to the counseling that went on
 
 in the effort to get settlement for Brumby. He (Brumby) spoke to L. G. Quintero, and enlisted' J. M. Quintero’s aid.
 
 Those letters were submitted to Mr. Brumby, and it is absolutely untrue that those letters
 
 were accidentally
 
 discovered on the floor or in the files of the firm. I remember with utmost clearness and distinctness, and I say positively and absolutely,
 
 that that correspondence was submitted to J. M. Quintero at the time, and it is untrue that he only discovered them just before the institution of this suit.
 

 “J. M. Quintero says that the first he knew of the pooling arrangement was
 
 in October, 1919;
 
 that is a deliberate false statement.
 
 The pooling arrangement was laid before L. G. and J.* M. Quintero by me, because I felt that it might be considered that I was getting a fee which I was not accounting to the partnership; and I wanted them to know of the arrangement and to participate in it if they so desired. That arrangement was mentioned by me, although 1 have a vague recollection of it, to Mr. Brumby.”
 

 After a thorough investigation of the facts and issues in this case, we have reached the conclusion that justice demands that defendant, an honorable member of the bar of this state, should receive a full and complete vindication as to all of the charges of fraud, dishonesty, and deceit preferred against him in the petition of the plaintiffs.
 

 The record is barren of proof that Mr. Caffery has received a cent of fees in any case in which he was not entitled to participate in a fee, to the detriment of his firm.
 

 Instead of the
 
 photographic copies of these letters
 
 indicating a conspiracy upon the part of Mr. Caffery to defraud his firm, by an improper division of fees in eases in which Mr. Richardson was not associated, the letters of Mr. Caffery, on the contrary, show plainly that he repudiated such suggestion, which had never entered his mind.
 

 We concur in the finding of the trial judge that the evidence fails to establish the charge that defendant did practice bad faith in the division of fees under the pooling arrangement with Mr. Richardson. The evidence is clear that this pooling arrangement was not entered into
 
 before
 
 the agreement was made between Mr. Caffery and the Quinteros as to the division of the contingent fee between them, in the proportion of two-thirds to Mr. Caffery and one-third to the Quinteros. It is also clear that this pooling arrangement was submitted by Mr. Caffery to the members of his firm.
 

 The evidence satisfies us that the fee of $1,000 claimed by plaintiffs in the foreclosure proceedings against the Vermillion Sugar Company belonged to the Franklin office, and that plaintiffs therefore have no interest in same under the partnership agreement of Caffery, Quintero & Brumby.
 

 As Mr. Caffery is entitled to the whole of the special fee of $25,000, that feature of the accounting between the members of the late firm is eliminated. He is entitled also to two-thirds of the contingent fee. The partnership affairs should be settled according to ilie following schedules:
 

 
 *1087
 

 Schedule B.
 

 Assets, Liabilities, and Net Worth.
 

 Assets.
 

 Cash ................................ $ 609 87
 

 Accounts receivable................. 1,939 69
 

 Books and fixtures.................. 1,003 30
 

 Total.................................... $3,552 S6
 

 Liabilities.
 

 Accounts payable................... $2,694 17
 

 Total ................................... $2,694 17
 

 Net firm worth.................................. $858 69
 

 Less depreciation on books, etc. (20% on $1,003.30) ....................................... 200 66
 

 Net valuation of firm worth................ $658 03
 

 Partners, inter sese, are not liable as they would be to third persons, each for his share of the debt, but each partner is liable to the firm for what he has overdrawn, and the firm is liable to the other partner or partners for the balance due him or them.
 

 So that, on a final settlement, the balance due any partner, or partners, must always be exactly equal to the sum of all overdrafts; and the judgment in such cases must be in favor of the partner who is not overdrawn for the amount of the balance due, but so divided that it will he against each overdrawn partner for the amount of his own overdraft and no more. 30 Oye. pp. 463, 464, points 36, 43.
 

 Partners owe each other no interest until the accounts are finally liquidated. 30 ■ Oye. p. 442, points 4 and 5.
 

 It .is therefore ordered that the judgment appealed from be annulled and reversed. It is now ordered that the demands of the. plaintiffs be rejected, and that there be judgment, in reeonvention, for the sum of $2,-117.54 in favor of Donelson Caffery, against the Succession of Lamar C. Quintero, herein represented by Mrs. Lamar C. Quintero, and J. Marshall Quintero, executors, and that there be judgment, in réconvention, for the sum of $904.37, in favor of Donelson Caffery against J. Marshall Quintero, with legal in
 
 *1089
 
 terest from March 1, 1926, the date of this judgment.
 

 It is further ordered that all costs of liquidation be divided equally between the Succession of Lamar C. Quintero, J. Marshall Quintero, and Donelson Caffery.
 

 ST. PAUL, J., concurs in the opinion handed down by the trial judge, and thinks his judgment should be affirmed.